PROPERTY OWNERS ASSOCIATION OF NORTH BERGEN, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. THE TOWNSHIP OF NORTH BERGEN, A MUNICIPAL CORPORATION IN THE COUNTY OF HUDSON, NEW JERSEY, AND THE NORTH BERGEN RENT LEVELING BOARD, DEFENDANTS-APPELLANTS.

Argued April 25, 1977—Decided September 12, 1977.

328

*Mr. Leon S. Wolk* argued the cause for appellants.

*Mr. Joseph A. Pojanowski, III,* argued the cause for respondents (*Messrs. Davies, Davies* and *Hall,* attorneys).

*Mr. Kenneth E. Meiser,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae,* Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Carl S. Bisgaier,* Deputy Director, and *Mr. Peter S. Buchsbaum,* Deputy Public Advocate, on the brief).

The opinion of the court was delivered by

SCHREIBER, J. Twenty-five owners of apartment buildings filed a complaint in lieu of prerogative writ challenging the validity of amendments to a rent control ordinance passed by the Township of North Bergen. The provisions in question regulated rents for senior tenants who lived in the plaintiffs' buildings located within the Township. Each of

these structures contained between 7 and 400 dwelling units. On cross-motions for summary judgment, the trial judge declared the amendments invalid. The Appellate Division, in an unreported opinion, affirmed. We granted certification. 71 *N. J.* 521 (1976).

On December 16, 1971, the Township of North Bergen (North Bergen) adopted an ordinance to regulate residential rents in buildings which contained more than six apartments. The prefatory language of the ordinance recited that an acute shortage of apartment dwelling units existed which had resulted in excessive rent increases with attendant hardships to all rent payers, that a housing state of emergency existed, and that in adopting the ordinance North Bergen was exercising its inherent power to protect the welfare of its citizens. The ordinance limited rental increases to percentages reflected in changes in the Consumer Price Index and created an Emergency Rent Leveling Commission to resolve disputes between landlords and tenants.

The ordinance was amended in June 1973 and May 1974. Those amendments excluded only owner occupied dwellings containing four or less housing units. In addition to rental increases predicated on changes in the Consumer Price Index (limited to 5% in any one year), the amendments provided for landlord relief in the event municipal property taxes were increased, or the landlord was unable financially to satisfy mortgage payments and maintenance needs (not to exceed 10% of the tenant's rent), or expenditures for major capital improvements were to be incurred (not to exceed 10% of the tenant's rent). Rent increases for all causes were limited to 15% in any one year.

On January 16, 1975, the Township adopted the amendments (Amendments) in question, which were to be effective for a three-year period commencing January 11, 1973. The parties have not raised, briefed, or argued the validity of the retroactive aspect of the ordinance and, accordingly, we shall not consider that issue. Nor is the question projected by this appeal, the validity of the Amendments, moot,

for the disputed amount of rent increases has been held in escrow pending determination of this action.

The Amendments created a special class designated as Senior Tenant, defined as every person aged 65 or over whose income, including that of his spouse, did not exceed $5,000. Income excluded gifts, inheritances, Social Security, Railroad Retirement and federal pension benefits, and all state and local governmental pensions of those who were not receiving Social Security. Senior Tenants were treated specially. Their rents were frozen as of December 1, 1974. Landlords could not increase rents for Senior Tenants. If, after the rents for other tenants had been raised up to 15%, the landlord had been found entitled to additional funds by the Emergency Rent Leveling Commission because of one or more of the grounds stated in the ordinance (Consumer Price Index increase, mortgage and maintenance need, or a major capital improvement), the Township would pay a rent subsidy to the landlord up to 10% of the rents paid by the Senior Tenants. The ordinance contained no provision which granted the landlord an opportunity to obtain relief in the event that he could justify an increase in excess of the recovery from the Township.

Judge Larner, the trial judge, in his oral opinion, after noting that the Amendments contained no recitation of motive for their adoption, commented that a municipality's desire to care for needy senior citizens is unquestionably laudatory. Holding that the Amendments caused an unconstitutional deprivation of property without due process, he reasoned as follows:

Now, more importantly, however, the Ordinance is unconstitutional as a deprivation of property without due process of law. By this Ordinance the Municipality seeks to establish a special subsidy for those who the fathers, the Legislative fathers of the Municipality think should get a break in connection with rent increases. This is a fine reason and something to be applauded. However, this can be constitutionally done only on the basis of an overall use of public funds which then is distributed among all the taxpayers by virtue of taxation. And so we have that in [m]any types of legislation

which counsel has cited where the burden rests upon the entire community, in which event special treatment of people in need is fully justified and constitutional. We have it from welfare up. We have senior citizen housing. We have other types of legislation which are properly protective of the rights where need appears [f]or special categories of persons. However, in every one of these instances the burden of supporting these people partially, of granting them a subsidy, is a public burden and should be borne by the entire community. Here, however, the Municipality undertakes to attempt to shift its burden, that is the burden of all the citizens and taxpayers of the Municipality, to a particular class of individuals, namely, persons who own property, and demand that those persons take care of the needs of the community as a whole. That to my mind constitutes a clear-cut taking of property without due process. Selecting a particular class of people in the community to subsidize another class of people in the community is hardly constitutional in its approach.

\*     \*     \*     \*     \*     \*     \*     \*

Now, in this area of discrimination I didn't mention during our colloquy one facet, namely, not only discrimination against the landlord, but I can see a potential of discrimination against other tenants in a building under the pattern of the Rent Control Ordinance of the Municipality. And it arises in this way: If a landlord is burdened with a reduction in his income by virtue of the failure and inability to increase the rents of senior tenants in his building because of this amendment and he is thereby compelled to apply for an overall hardship increase within the additional ten percent permitted in the legislation, and such increase is granted, then, in effect, the other tenants in the building who are not sixty-five and who have an income over $5,000 will ultimately be paying more rent because of the lack of contribution by these other tenants towards the overall income of the landlord. This is another form of discrimination which is a practical result of this kind of legislation by the Municipality.

So that all in all I find that there is no basis for supporting this legislation and that the purpose of helping elderly, although excellent in concept, cannot be done at the expense of an individual property owner.

The Appellate Division agreed with Judge Larner's analysis, pointing out that the landlord may never be compensated for each Senior Tenant's pro rata share above the 10% subsidy. It concluded that to the extent that the landlord will not be compensated for what is justly due him, the landlord would be called upon to subsidize the Senior Tenant or Tenants residing in the apartment house.

The Appellate Division also found that the stated objective of the ordinance, the alleviation of *all* tenants' hardships due to a housing shortage and excessive rents, was not reasonably related to the classification of Senior Tenants — for the evil was equally applicable to many under age 65, whose incomes do not exceed $5,000 and whose needs may be equal to or greater than those of a Senior Tenant. Lastly, it condemned the definition of net income which, for example, excluded, *inter alia,* state and other local governmental pensions of persons who were not receiving Social Security, and which did not consider assets, gifts or inheritances, so that, in some cases, Senior Tenants with more spendable cash than others with less funds received the benefits of the Amendments.

▪ We are in full accord with Judge Larner that subsidization of housing for the elderly may well be an appropriate subject for legislation in furtherance of the public welfare. Justice Pashman in his comprehensive opinion in *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 71 *N. J.* 249 (1976), graphically described the economic problems which face many of our older citizens. He wrote for the Court:

In part the need of the elderly for specialized housing results from the fixed and limited incomes upon which many older persons are dependent. In 1970, 82.3% of households in New Jersey with persons over the age of 65 had incomes of less than $10,000 and 62.1% had incomes of less than $5,000. *N. J. Office on Aging, Detailed Housing and Income Information on the Elderly of New Jersey* 2 (1973). By comparison, the median income for all families in New Jersey at that time was $11,407. Because many of the elderly derive their incomes from pensions, social security or other government benefit programs, or from interest on savings or income-producing securities, they are among those hardest hit by inflation and the current statewide housing shortage. *N. J. Dep't of Community Affairs, The Housing Crisis in New Jersey 1970* (1970). Consequently, many of the elderly cannot afford housing specifically designed for their needs, and in many cases are actually obliged to live in substandard housing. *Housing New Jersey's Elderly, supra* at 3. Many others must devote a disproportionate amount of their available resources to housing costs. *N. J. Office on Aging, Detailed*

*Housing and Income Information on the Elderly of New Jersey,* *supra* at 4. Moreover, those who are homeowners must often forego proper maintenance and upkeep of their homes. *Retirement Communities, supra* at 2. [*Id.* at 268–269]

That appropriate legislative action may be taken to ameliorate the financial problems of senior citizens is indisputable. The Legislature has seen fit to enact legislation to assist senior citizens. *See, e. g., N. J. S. A.* 55:14I–1 *et seq.* (senior citizen non-profit housing for lower middle-income families at rentals which this class can afford). The difficulty in this case arises because of the *method* employed by the Township.

In *Hutton Pk. Gardens v. West Orange Town Council,* 68 *N. J.* 543 (1975), following its holding in *Inganamort v. Bor. of Fort Lee,* 62 *N. J.* 521 (1973), the Court upheld a municipal rent control ordinance, provided that such "rent regulation must permit a just and reasonable return." 68 *N. J.* at 569. Writing for the majority Justice Pashman expressed several basic principles which are significant here:

The existence of a chronic housing shortage of indefinite duration would not justify depriving property owners of a fair return for an indefinite period. [*Id.* at 566–567]

In ordinary circumstances, price controls which do not permit an economically efficient operator to obtain a "just and reasonable" return on his investment are deemed confiscatory. [*Id.* at 568]

\*        \*        \*        \*        \*        \*        \*

The requirement that rent regulation must permit a just and reasonable return does not place any undue restriction on the mechanism of regulation. The regulatory scheme need not take a particular predetermined form. So long as the means chosen to accomplish the object are not wholly arbitrary and unreasonable, the courts are concerned solely with the question of whether the return actually permitted is just and reasonable. [*Id.* at 569]

He concluded that:

Every rent control ordinance must be deemed to intend, and will be so read, to permit property owners to apply to the local administrative agency for relief on the ground that the regulation entitles the owner to a just and reasonable rate of return. [*Id.* at 572]

■ All parties concede that, although the North Bergen ordinance has no express provision assuring that the landlord will have the opportunity to receive a just and reasonable rate of return, such a provision must be impliedly deemed to have been incorporated in it. However, because of the unique rental treatment of Senior Tenants, the provision that a landlord shall be entitled to a just and reasonable rate of return may be violated.

■ ■ The ordinance is not a model of clarity, but it does provide that if a landlord were entitled to rents in excess of (a) the 15% increase which would be borne by the tenants (other than Senior Tenants) and (b) the Township's 10% rental subsidy, the landlord would be called upon to subsidize the Senior Tenants to that extent. Under the terms of the ordinance, the landlord may not recoup any additional funds to which he is rightfully entitled. Imposition of that burden would deprive an owner of property without due compensation. Such rent control is confiscatory and unconstitutional. *Troy Hills Village v. Parsippany-Troy Hills Council*, 68 *N. J.* 604, 620 (1975); *U. S. Const.*, Amend. XIV; *N. J. Const.* (1947), Art. I, par. 1. *Cf. In re Intrastate Industrial Sand Rates*, 66 *N. J.* 12, 23–24 (1974) (unreasonably low rates are confiscatory of utility's right of property). Landlords with no tenants in the Senior Tenant category would receive all the funds to which they are constitutionally entitled. Landlords with all or some Senior Tenants would be deprived of varying percentages of that constitutional entitlement depending upon the number of Senior Tenants residing in their buildings. Such uneven treatment may well constitute a denial of constitutional equal protection. In this context this Court wrote in *Washington National Ins. Co. v. Board of Review*, 1 *N. J.* 545, 553 (1949):

The legislation is unequal, partial and discriminatory; it treats members of the same class differently, capriciously denying to some the benefits granted to others. "Arbitrary selection can never be justified by calling it classification. The equal protection demanded

by the Fourteenth Amendment forbids this." *Gulf, C. & S. F. Ry. Co. v. Ellis*, 165 *U. S.* 150, 17 *S. Ct.* 255, 41 *L. Ed.* 666 (1897).

As noted above, under the ordinance, when a landlord is entitled to additional rents, the initial burden falls exclusively upon the shoulders of the non-Senior Tenants, who in a given case may be financially less capable of bearing the increase than the Senior Tenants. Imposition of such cost on the other tenant or tenants residing in the apartment building may not pass constitutional muster.[1] For example, suppose that nine of ten tenants are Senior Tenants so that the financial burden would be imposed on the one remaining tenant. The relationship between this tenant and his cotenants does not justify imposing on him the duty of assisting in the payment of their rent. This is quite distinct from the public recognizing and assuming an obligation to assist the elderly or where the cost is spread over a large number of people so that the effect is minimal.

The Public Advocate, conceding that landlords are entitled to a fair return upon their investment, contends that the subsidization should be borne by the remaining tenants who are not Senior Tenants. The Advocate relies upon public utility rate structure decisions wherein certain types of users have been charged less than their cost of service and others in excess thereof. *See, e. g., St. Paul Area Chamber of Commerce v. Minn. P. S. Comm'n*, 251 *N. W.* 2d 350 (Minn. 1977). At oral argument he asserted that the trial court should exercise its discretion in determining whether the financial burden should be placed on the remaining tenants, the Senior Tenants or all tenants in the building.

■ ■ None of those contentions is persuasive. Even assuming the constitutionality of each of these proposals, the ordinance does not expressly or impliedly impose this bur-

---

[1]The parties, including the Public Advocate, have not objected to consideration of the impact of the ordinance on non-Senior Tenants. We observe that landlords may have a tangible interest where their tenants' occupancy and rent paying ability may be affected.

den in any of the suggested methods and we cannot assume that the municipal governing body intended to apply any particular solution. Perhaps the municipality might increase its subsidy or spread the costs among the public in some other manner. The judiciary should not exercise a discretion entrusted to the legislative body. Gaps in an ordinance may be filled when the legislative intent is clear and judicial construction will further the legislative goal. *See, e. g., Camarco v. City of Orange,* 61 *N. J.* 463 (1972). But where the path is not clear, then the courts should refrain from usurping the legislative function. *Orvil v. Woodcliff,* 61 *N. J. L.* 107, 111–112 (Sup. Ct. 1897); 2A *Sutherland Statutory Construction* § 47.38, at 172–173 (4th ed. 1973).

North Bergen relies substantially on the New York Court of Appeals decision in *Parrino v. Lindsay,* 29 *N. Y.* 2d 30, 323 *N. Y. S.* 2d 689, 272 *N. E.* 2d 67 (1971). New York City had adopted an ordinance which exempted from rent increases tenants who were 62 years of age or older, whose total annual income when added to other members of the household did not exceed $4500 and who paid more than one-third of such income for rent. The New York City ordinance prevented rent increases between August 1, 1970 and January 1, 1972, a period of one year and five months. The court, noting that the landlords were entitled to charge the maximum rents in effect on July 31, 1970 under a prior ordinance and that the rent freeze was for a limited period, held there was no impermissible taking of property. Although the court did not articulate its reasons, it apparently believed there existed an unusual situation of finite, short duration which justified that result. *See Hutton Pk. Gardens v. West Orange Town Council,* 68 *N. J.* at 566. Those factual circumstances are not present here and we do not find *Parrino* persuasive.

We reiterate that under its police power a municipality may in the interests of the general welfare enact ordinances to assist senior citizens provided the relationship between the purposes and the classification is rational and

sound and there is not an undue taking of property of others which amounts to a constitutional confiscation. A legislative category of economically needy senior citizens is sound, proper and sustainable as a rational classification. But compelled subsidization by landlords or by tenants who happen to live in an apartment building with senior citizens is an improper and unconstitutional method of solving the problem. In view of our holding herein, we have found it unnecessary to discuss the equal protection arguments adverted to by the Appellate Division.

Affirmed.

PASHMAN, J., dissenting. The majority holds that the ordinance involved here is unconstitutional because it may, in certain instances, deprive landlords of their property without due process of law. This conclusion is based on its finding that the 15% ceiling on rent increases embodied in the law, even with rent subsidies from the municipality, may prevent a landlord from receiving a reasonable return on his property. Second, it finds that the disparity in treatment of seniors and non-senior tenants in controlled buildings is improper. It reasons that the ordinance places an unfair burden on non-senior tenants since they will be called upon to pay higher rents as a result of the ordinance. However, it is unclear what significance the majority attaches to this second ground, since it refuses to find that this scheme results in a denial of equal protection.

The first ground relied upon by the majority for striking down the ordinance is easily disposed of by referring to the majority's own opinion. As Mr. Justice Schreiber states for the Court:

although the North Bergen ordinance has no express provision assuring that the landlord will have the opportunity to receive a just and reasonable rate of return, such a provision must be impliedly deemed to have been incorporated in it.

[*Ante* at 336]

The fact that this ordinance refers to a 15% ceiling on rent increases, then, should not bar the landlord from applying for a greater increase where it would be necessary in order to ensure a just and reasonable return.

This conclusion seems inescapable since we held in *Hutton Pk. Gardens v. West Orange Town Council*, 68 *N. J.* 543 (1975) that:

An ordinance is not rendered facially unconstitutional by the fact that it does not expressly include a provision assuring a just and reasonable return in its regulatory mechanism. * * * Every rent control ordinance must be deemed to intend, and will be so read, to permit property owners to apply to the local administrative agency for relief on the ground that the regulation entitles the owner to a just and reasonable rate of return.

[68 *N. J.* at 572; citation omitted]

We upheld the ordinance there even though it provided, as does this one, for an overall ceiling on rent increases. 68 *N. J.* at 552–53. Thus, I see no reason to distinguish the result reached today from our recent holding in that case.[1]

Moreover, we held there that an *actual* showing of an inability to achieve a reasonable rate of return was required in order to demonstrate the facial unconstitutionality of a statute. Referring to the ordinances in that case, we stated:

Although the total increases permitted under these ordinances are sharply limited, and may be less than price increases prevailing in other sectors of the economy, . . . , we cannot say *a priori* that the ordinances preclude any possibility of permitting a just and reasonable return to apartment house owners in general. The return

[1]Curiously, if the ceiling requirement were unconstitutional, the instant ordinance would fall even without the senior tenant amendments. Although the majority finds it necessary to hypothesize that 9 out of 10 tenants in a building may be senior, the 15% ceiling would render the ordinance unconstitutional under the majority analysis even if a building contained no senior tenants: as long as a landlord needed a 16% increase in order to arrive at a reasonable return, the ordinance would be unconstitutional. However, as I have pointed out, this result is preclued by our recent holding in *Hutton Pk. Gardens, supra.*

which landlords were obtaining at the base rent levels may well have been so far above the just and reasonable mark that the present diminished rate of return may still be more than just and reasonable even if current cost increases are outpacing permissible rent increases.

[68 *N. J.* at 571–72; citation omitted]

Significantly, that ordinance provided for a 10% ceiling on rent increases. The instant ordinance not only provides a higher ceiling, 15%, but it also expressly includes the possibility of receiving subsidies from the municipality. See *ante* at 336.[2]

I find the majority's second "fatal flaw" to be equally defective. Essentially, the majority argues that the ordinance impermissibly spreads the cost of the rent reduction for senior citizens among a small group of persons, instead of requiring the public to assume this obligation or spreading the cost among a large group of persons. See *ante* at 337. Although stopping short of such a holding, the majority concludes that "[s]uch uneven treatment may well constitute a denial of constitutional equal protection." *Ante* at 336.

---

[2]The majority asserts that even if the ordinance could be rendered constitutional by allowing a landlord to charge increases which would provide him with a reasonable return, the Court is powerless to interpret the ordinance to provide for that result. See *ante* at 337–338. As I have already pointed out, there is no need to engage in such "judicial surgery" here since there has been no showing that the ordinance is facially unconstitutional. However, even if the ordinance had been shown to be unconstitutional as applied, we have stated on numerous occasions that an invalid portion of an ordinance may be severed if in doing so the principal object of the enactment is not impaired. *Inganamort v. Borough of Fort Lee,* 72 *N. J.* 412, 422 (1977); *N. J. Chapter. Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 593 (1967), appeal dismissed and *cert.* den. 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967). The existence of a severability provision in the instant ordinance gives rise to a presumption that the 15% overall ceiling on increases could be severed from the remainder of the ordinance if necessary to save the enactment from being invalid. *See Inganamort v. Borough of Fort Lee, supra,* 72 *N. J.* at 422; *Brunetti v. Borough of New Milford,* 68 *N. J.* 576, 600 at n. 23 (1975).

However, the majority's concerns in this case are wholly speculative. I would have serious doubts about the propriety of striking down the ordinance on the basis of its harm to tenants. Significantly, no tenant is even a plaintiff in this case or has sought to make his disagreement with the ordinance known. While it is appropriate at times to allow a plaintiff to assert the constitutional rights of another person or group, *see Barrows v. Jackson,* 346 *U. S.* 249, 73 *S. Ct.* 1031, 97 *L. Ed.* 1586 (1953); *In re Quinlan,* 70 *N. J.* 10, 34 (1976), *cert.* den. —— *U. S.* ——, 97 *S. Ct.* ——, 53 *L. Ed.* 2d —— (1976). I do not believe that this is such a case. Standing requirements are more permissive under State than Federal precedents, but we have not abandoned the requirement that a litigant must demonstrate a "sufficient stake and real adverseness" in order to have a claim considered. *Crescent Park Tenants Ass'n v. Realty Equities,* 58 *N. J.* 98, 107 (1971); *In re Quinlan, supra,* 70 *N. J.* at 35. Here the impact of the senior tenant amendments on remaining tenants is wholly speculative, and there is a substantial likelihood that their actual impact may be *de minimis.* Additionally, there is no inherent inability on the part of tenants to be joined in this suit. *Barrows v. Jackson, supra,* 346 *U. S.* at 257, 73 *S. Ct.* at 1035, 97 *L. Ed.* at 1596. It is perfectly plausible that non-senior tenants might be willing to pay a slightly higher rental at this time since they may receive the benefit of the ordinance in the future if they continue to live in the community.

Nor am I convinced that the ordinance would be unconstitutional even if it did impose some burden upon non-senior tenants. The majority's argument, if accepted, would undermine most forms of regulation. Surely it would not contend that any form of price regulation is unconstitutional merely because it created the potential of higher costs for a certain class of consumers, as opposed to spreading the cost across the community as a whole.

For instance, a rent control generally imposes a burden on a small group of persons. Under a rent measure a land-

lord is usually required to forego a portion of the rent which he might have otherwise charged tenants. Even though he is guaranteed a reasonable rate of return, it cannot be denied that he suffers a "burden" because of the rate restriction.[3] Yet our recent holdings in *Hutton Pk. Gardens v. West Orange Town Council, supra; Brunetti v. Borough of New Milford,* 68 *N. J.* 576 (1975); and *Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 *N. J.* 604 (1975), make it obvious that rent control ordinances are not unconstitutional merely because the community as a whole does not share in the landlord's "burden." In fact, it might be asserted that the instant enactment presents even less of a problem than a normal rent control measure since it allows the landlord to resort to remaining tenants in his building to share the burden along with him.

The only remaining question which might be considered is whether senior tenants are an improper group to receive rent protection. Thus, it might be theorized that there are other tenants in the building who are more needy than some who receive the benefit of the ordinance. However, the simple answer to this argument is that legislation need not operate perfectly in order to pass constitutional muster. In rejecting another equal protection attack in *Troy Hills Village v. Parsippany-Troy Hills Tp. Council, supra,* we stated:

'Equal protection is not denied because a regulatory statute might have gone farther than it did, or might have included some persons or classes of persons who were excluded. Regulatory need in a particular field may appear to the legislative mind in different dimensions and proportions; as more acute in one area than in another.

---

[3]There is a disparity between what a landlord is constitutionally guaranteed and what he might have received had there been no rent control. As we stated in *Hutton Pk. Gardens v. West Orange Town Council, supra,* "constitutional principles require only that the landlord be permitted to obtain a just and reasonable return; they do not require that landlords uniformly be permitted to pass particular costs through to their tenants." 68 *N. J.* at 574.

Consequently, the reform may proceed one step at a time, addressing itself to the aspect of the problem which seems the most pressing.'

> [68 *N. J.* at 633, quoting from *N. J. Chapter, Am. I. P. v. N. J. State Bd. of Prof Planners,* 48 *N. J.* 581, 593 (1967), appeal dismissed and *cert.* den. 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967)]

*Accord, Pleasure Bay Apartments v. Long Branch,* 66 *N. J.* 79, 93–95 (1974) ; *Dandridge v. Williams,* 397 *U. S.* 471, 486–87, 90 *S. Ct.* 1153, 1162–63, 25 *L. Ed.* 2d 491, 502–03 (1970). Furthermore, the majority concedes that "appropriate legislative action may be taken to ameliorate the financial problems of senior citizens. . . ." *Ante* at 335. It finds that this conclusion is "inescapable." *Id.*

Although North Bergen's ordinance contains within one enactment both rent control restrictions and favored treatment for senior citizens, I cannot accept the majority's objections to it. Our task in reviewing this ordinance may be characterized by the oft-repeated statement that a court's role is not to review the wisdom of a piece of legislation, but merely its constitutionality. In *Troy Hills Village, supra,* we held that "the wisdom of the regulatory policy which it has adopted, is not pertinent to the constitutional challenge made to the ordinance." 68 *N. J.* at 632; footnote omitted. It is irrelevant that we might have drafted the ordinance to require the municipality to pay for the entire reduction in rents for senior tenants. Similarly, we are not authorized to strike down the legislation even though we might have based eligibility for rent protection solely on a tenant's income, as opposed to age. Bearing in mind this limitation on our review power, I can find nothing objectionable about the instant ordinance.

I would reverse the Appellate Division and uphold the constitutionality of the ordinance.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For reversal* — Justice PASHMAN—1.